IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF OKLAHOMA

REBECCA TOWERY-CAMPBELL      )
and E.T., a minor,           )
                             )
            Plaintiffs,      )
v.                           )    Case No. 06-CV-162-JHP
                             )
UNITED STATES OF AMERICA     )
                             )
            Defendant.       )

**FINDINGS OF FACT AND CONCLUSIONS OF LAW**

Rebecca Towery-Campbell ("Towery-Campbell") entered Carl Albert Indian Hospital in Ada, Oklahoma ("CAIHF") on May 26th, 1997 to give birth to her second child. Towery-Campbell originally planned to give birth naturally, but on May 27th she suffered a uterine rupture and had to undergo an emergency caesarean section. As a result of the ruptured uterus, Towery-Campbell's child, E.T., sustained serious and permanent injuries. Because of the permanency of her injuries, E.T. will need medical care for the rest of her life.

On February 27th 2006, Towery-Campbell filed a Federal Tort Claims Act suit against the defendant on behalf of herself and her daughter, E.T. The lawsuit alleges negligent medical care during the labor for and delivery of E.T. at CAIHF. Plaintiffs allege the doctor and nurses at CAIHF, as employees of the United States, failed to provide medical care within the national standard of care, and allege this failure proximately caused permanent and severe injuries to the Plaintiffs. Plaintiffs allege six specific violations of the national standard of care on the part of Defendant:

1. Monitor Rebecca Towery-Campbell and avoid uterine rupture.
2. Monitor E.T. by examination and by external fetal monitoring at all clinically necessary times.

1

     3.      Perform a timely caesarean section.
     4.      Provide timely and appropriate intervention given the clinical presentation so as to timely assess and diagnose the need for an earlier caesarean section.
     5.      Provide proper medical and nursing care and treatment.
     6.      Properly inform the doctor, Brent Woodfield, of the true clinical presentation of Rebecca Towery-Campbell; and
     7.      Be timely available to address an emergency birth such that the doctor, Brent Woodfield, did not make himself timely and expeditiously available.

[Docket No. 111 at 9]. Defendant claims the care and treatment of Plaintiff was appropriate in all regards and that the proximate cause of the injuries to Plaintiffs was an unavoidable, catastrophic event.

The matter came on for non-jury trial October 29th, 30th, and November 1st, 5th, 2007.

## **Findings of Fact**

### A. The Events

     1.      Rebecca Towery-Campbell was due to deliver her second child on May 26, 1997. (Jt. Stp. No. 13)

     2.      Towery-Campbell delivered her first child through cesarean section, but wished to deliver her second child vaginally. (Trial Transcript Volume III, Testimony of Rebecca Towery-Campbell, "T.T. Vol. 3, Towery" Pg. 440, ln. 8-19)

     3.      Towery-Campbell was attempting a vaginal birth after cesarean, referred to as a "VBAC". (Trial Transcript Volume I, Testimony of Plaintiff's expert, Dr. Philip Cohen, "T.T. Vol.1, Cohen" Pg. 20, ln. 12-16)

     4.      In 1997, the medical community knew that VBAC patients had a higher risk of uterine rupture than patients not having a previous uterine incision. (T.T. Vol.1, Cohen Pg. 106, ln. 11-19)

     5.      Towery-Campbell began experiencing contractions on the night of May 26, 1997 and went to CAIHF. (Jt. Stp. No. 12)

     6.      CAIHF admitted Towery-Campbell at approximately 2:00 am on May 27th, 2007, for "sedation and observation." (Carl Albert Indian Health Facility records Joint Exhibit 1 "Jt. Ex. 1" Pg. 61, 62)

2

7. Upon admission, Towery-Campbell was not in the active phase of labor, she was instead in "prodromal"—also know as "latent"—labor. (T.T. Vol.1, Cohen Pg. 43, ln. 6-8)

8. Prodromal labor is labor without progression of cervical dilation. (Trial Transcript Volume I, Testimony of Defendant's expert, Dr. Stephen Myers, "T.T. Vol.II, Myers" Pg. 254, ln. 23-24)

9. "Active" labor is defined as labor involving rapid cervical dilation. (T.T. Vol.5, Myers Pg. 564, ln. 23-24)

10. Shortly after admission, at approximately 2:00 a.m. on May 27th, Towery-Campbell received pain medication that would also help her sleep. (Jt. Ex. 1, Pg. 86)

11. At approximately 3:30 a.m, Susana Mariano, RN, recorded that Towery-Campbell was resting with her eyes closed and that the pain medication was effective. (Jt. Ex. 1, Pg. 86)

12. At approximately 5:30 a.m. Susana Mariano, RN, recorded that Towery-Campbell was still resting with her eyes closed. (Jt. Ex. 1, Pg. 86)

13. At approximately 8:00 a.m. Towery-Campbell was seen by a Certified Nurse Midwife ("CNM"), Nancy Hobbs who performed a sterile vaginal examination. (Jt. Ex. 1, Pg. 77)

14. Hobbs noted that Towery-Campbell described her contractions as unchanged and that Towery-Campbell was still in prodromal labor. (Jt. Ex. 1, Pg. 77)

15. At approximately 9:34 a.m. June Walker, RN obtained and recorded vital signs for both Towery-Campbell and E.T. (Jt. Ex. 1, Pg. 85)

16. At 9:34 a.m., Towery-Campbell was hooked up to the external fetal monitor. (Fetal monitor strips of Rebecca Towery-Campbell and E.T., Joint Exhibit 2 "Jt. Ex. 2")

17. At approximately 10:15 a.m. Towery-Campbell was again seen by Nancy Hobbs, CNM. (Jt. Ex. 1, Pg. 76)

18. Hobbs noted that Towery-Campbell was describing her pain as a "tearing or burning feeling" in her lower abdomen. (Jt. Ex. 1, Pg. 76)

19. Hobbs recommended an ultrasound to evaluate the condition of Towery-Campbell's uterine scar and to estimate the weight of the fetus. Hobbs also recommended that the external fetal monitoring continue. Hobbs consulted with Dr. Woodfield and he agreed with her recommendation. (Jt. Ex. 1, Pg. 76)

20. At approximately 10:30 a.m. Nancy Hobbs, CNM ordered the ultrasound. (Jt. Ex. 1, Pg. 68)

21. About 5 minutes later at approximately 10:35 a.m., an ultrasound was performed. (Jt. Ex. 1, Pg. 68)

22. After the ultrasound had been performed, the "radiology lady" stated everything looked normal. (T.T. Vol. III, Towery, Pg. 466, ln. 19-23)

23. Hobbs also examined the ultrasound and concluded that it appeared normal. (T.T. Vol. III, Towery, Pg. 466, ln 24 - Pg. 467, ln 2)

24. At approximately 12:40 p.m. Dr. Woodfield discussed three options with Towery-Campbell; discharge to home, Cervidil, or a second caesarean section. (Jt. Ex. 1, Pg. 76)

25. At approximately 1:15 p.m. Nancy Hobbs, CNM, examined Towery-Campbell and found no cervical change. Hobbs also noted that Towery-Campbell reported her contractions were "about the same." Hobbs and Towery-Campbell discussed the three options Dr. Woodfield had given Towery-Campbell. Towery-Campbell did not decide which option she wanted to pursue at this time. Hobbs noted that she was awaiting Towery-Campbell's decision. (Jt. Ex. 1, Pg. 76)

26. At approximately 2:45pm, Towery-Campbell requested the Cervidil, and it was inserted at that time. (Jt. Ex. 1, Pg. 76)

27. Cervidil is a prostoglandin insert designed to ripen the cervix and induce labor. (T.T. Vol. V, Cohen, Pg 532, ln. 3-13)

28. In 1997, it was within the national standard of care to use Cervidil on a patient attempting a VBAC—so long as the uterine scar was intact. (T.T. Vol. I, Cohen, Pg 24, ln. 18-24)

29. At the time the Cervidil was placed, there was nothing to indicate that Towery-Campbell's uterine scar was not intact. An ultrasound had been ordered for the specific purpose of determining whether the

4

uterine scar was intact and both medical personnel that examined the ultrasound concluded that the ultrasound showed nothing out of the ordinary. (T.T. Vol. III, Towery, Pg. 466-67, ln. 19-25, 1-2)

30. At approximately 2:45 p.m. after placing the Cervidil, Nancy Hobbs, CNM, ordered continuous fetal monitoring for two hours and then PRN and vital signs with fetal heart rate every four hours. A pain medication was ordered if needed and a sleeping aid was ordered for bedtime. (Jt. Ex. 1, Pg. 68)

31. After the Cervidil was placed, Towery-Campbell's contractions felt like painful squeezing. (Jt. Stp. No. 23)

32. At approximately 3:05 p.m. intravenous fluids were ordered by Nancy Hobbs, CNM and started by June Walker, RN because Towery-Campbell had consumed no food or water by mouth since noon. (Jt. Ex. 1, Pg. 68)

33. It is normal for a woman in pre-labor be administered intravenous fluids. (T.T. Vol. I, Cohen, Pg. 97, ln. 7-10)

34. At approximately 5:04 p.m.—and consistent with Hobbs' orders—Towery-Campbell was removed from the external fetal monitor. (Jt. Ex. 2)

35. At approximately 5:10 p.m. an order was written for Tylenol which was given to Towery-Campbell at approximately 5:15 p.m. (Jt. Ex. 1, Pg. 67)

36. At approximately 7:20 p.m. pain medication was given. (Jt. Ex. 1, Pg. 86)

37. The medication Towery-Campbell was given was routinely administered for pain associated with normal contractions. (Trial Transcript Volume II, Testimony of Nyokia Ware, "T.T. Vol.2, Ware" Pg. 358-59, ln. 22-25, 1)

38. When Towery-Campbell requested pain medication, her contractions were evaluated by the nursing staff and a sterile vaginal exam was performed. (T.T. Vol.2, Ware Pg. 356-57, ln. 19-25, 1-24)

39. After the sterile vaginal exam, the external fetal monitor was hooked back up at approximately 8:04 p.m. (Jt. Ex. 2)

40. The baby appeared normal when the fetal monitor was reapplied. (T.T. Vol. II, Ware, Pg. 357-58, ln. 21-25, 1-2)

41. At approximately 8:25 p.m., while still on the external fetal monitor, Towery-Campbell decided she wanted the Cervidil removed. (Jt. Ex.1, Pg. 86)

42. At approximately 8:25 p.m., Towery-Campbell decided she wanted to abandon her attempt to deliver her child vaginally and to instead have a caesarean section. (Jt. Ex. 1, Pg. 86)

43. At approximately 8:25 p.m., Dr. Woodfield was contacted by telephone and informed of Towery-Campbell's decision. At that time he ordered the Cervidil be removed. (Jt. Ex. 1, Pg. 67 and 86)

44. The fetal heart tracing prior to the removal of the Cervidil was normal. (T.T., Vol I, Cohen, Pg. 126, ln. 4 - 7)

45. At some point during the 8:10 p.m. to 8:50 p.m. time period, Towery-Campbell experienced approximately 15-20 minutes of hyper-stimulation of her uterus. (T.T., Vol I, Cohen, Pg. 29-32)

46. Hyper-stimulation of the uterus is excessive uterine activity that can lead to uterine rupture if ignored (T.T., Vol I, Cohen, Pg. 26, ln. 17-25)

47. The medically appropriate course of action when administration of Cervidil is accompanied with hyper-stimulation of the uterus is to remove the Cervidil. (T.T., Vol I, Cohen, Pg. 32, ln. 12-14)

48. Upon removal of the Cervidil, the hyper-stimulation usually resolves itself within one minute. (T.T., Vol II, Myers, Pg. 269, ln. 19-22)

49. The electronic fetal monitor was removed at 8:47 p.m. (Jt. Ex. 1, Pg. 86, Jt. Ex. 2)

50. The Cervidil was removed at approximately 8:50 p.m. (Jt. Ex. 1, Pg. 86, Jt. Ex. 2)

51. When the Cervidil was removed, Towery-Campbell was still not in active labor. (T.T., Vol I, Cohen, Pg. 126, ln. 18 - 20)

52. Dr. Woodfield ordered that Towery-Campbell be scheduled to have

an elective caesarean section the next morning. (Jt. Stp. No. 31)

53. Dr. Woodfield's order was medically appropriate. (T.T. Vol. I, Pg. 52, ln. 13 - 19)

54. At approximately 9:00 p.m., Towery-Campbell stated that she was very hungry and was given clear liquids. (Jt. Ex. 1, Pg. 86)

55. One hour later, at approximately 10:00 p.m., Towery-Campbell got up to go to the bathroom. (Jt. Ex. 1, Pg. 86)

56. While returning from the bathroom Towery-Campbell felt a painful "pop" in her lower abdomen. (T.T. Vol. III, Towery, Pg. 452, ln. 17-23)

57. This pain evidenced the beginning of a uterine rupture. (T.T. Vol. II, Myers, Pg. 302, ln. 3-5)

58. Towery-Campbell became very agitated and loudly vocalized the pain she was experiencing. (T.T. Vol. III, Towery, Pg. 452-53, ln. 24-25, 11-16)

59. The nurses immediately came into Towery-Campbell's room and attempted to calm her down. (T.T. Vol. III, Towery, Pg. 453, ln. 1-5)

60. Towery-Campbell told the nurses she "was hurting real bad and having a contraction." (T.T. Vol. III, Towery, Pg. 453, ln. 13-14)

61. Sometime between 10:00 p.m. and 10:30 p.m., while Towery-Campbell was still vocalizing her pain and "moving around a bunch" because of the pain, the nurses attempted to hook Towery-Campbell back up to the external fetal monitor, but had trouble getting the monitor properly positioned and working. (T.T. Vol. III, Towery, Pg. 453-54, ln. 23-25, 1-24)

62. At 10:30 p.m. the nurses were able to get the external fetal monitor in place and working. The fetal baseline heart rate was measured at 140-150 bpm. (Jt. Ex. 2)

63. At approximately 10:30 p.m. Towery-Campbell asked for additional pain medication. (Jt. Ex. 1, Pg. 86)

64. The medical records reflect that none of the pain that Towery-Campbell complained of up to this point was of a type not normally associated with a full-term mother attempting delivery of her child.

7

(T.T. Vol. I, Cohen, Pg. 87, ln. 3-14)

65. Between 10:32 p.m. and 10:34 p.m. two decelerations of the fetal heart rate were recorded on the monitor with a return to baseline of 140-150 bpm. (Jt. Ex. 2)

66. The nurses who were present immediately undertook intrauterine resuscitative efforts, including providing oxygen by mask to the mother, increasing IV flow, and placing Towery-Campbell on her side. (T.T. Vol. I, Cohen, Pg. 64, ln. 1-4)

67. These interventions were medically appropriate in all respects. (T.T. Vol. I, Cohen, Pg. 129, ln. 10-13)

68. One minute after these interventions, at approximately 10:35 p.m., Dr. Woodfield was notified by telephone of the decelerations. (Jt. Ex. 1, Pg. 86)

69. Dr. Woodfield was at his home when he received the telephone call at approximately 10:35 p.m. (Jt. Stp. No. 40)

70. At approximately 10:40 p.m. Towery-Campbell was turned to her right side, her IV fluids were increased and the head of her bed was lowered. (Jt. Ex. 1, Pg. 86 and Jt. Ex. 2)

71. The fetal monitor tracing became increasingly unreassuring and at approximately 10:50 p.m. a second call was made to Dr. Woodfield about the decelerations. (Jt. Ex. 1, Pg. 86)

72. When the second telephone call was placed to Dr. Woodfield, at approximately 10:50 p.m., there was no answer. (T.T. Vol. III, Susana Mariano, "Mariano", Pg. 425, ln. 7 - 22)

73. Dr. Woodfield left for the hospital sometime in between the 10:35 p.m. telephone call notifying him of the decelerations and the 10:50 p.m. phone call that went unanswered. (T.T. Vol. III, Testimony of Dr. Brent Woodfield, "Woodfield" Pg. 399-400, ln. 23-25, 1-2)

74. Dr. Woodfield arrived at Towery-Campbell's bedside at approximately 10:56 p.m., 21 minutes after first being called. (Jt. Ex. 1, Pg. 86)

75. Upon his arrival at Towery-Campbell's bedside, Dr. Woodfield assessed her condition. (T.T. Vol. I, Cohen, Pg. 65, ln. 20-21)

76. Dr. Woodfield made the decision to deliver E.T. by emergency cesarean section sometime in between his arrival at 10:56 p.m. and 11:00 p.m. (Jt. Ex. 1, Pg. 86)

77. Towery-Campbell was immediately taken to the operating room, arriving at approximately 11:00pm. (T.T. Vol. I, Cohen, Pg. 65, ln. 22-25)

78. The standard of care requires the time from the decision to perform a caesarean section until the actual incision be thirty minutes. (T.T. Vol. II, Myers, Pg. 329, ln. 3-6)

79. E.T. was delivered at 11:16 p.m. on May 27, 1997, 16-20 minutes after the decision to deliver her by cesarean section was made. (T.T. Vol. I, Cohen, Pg. 72-73, ln. 24-25, 1)

80. While delivering E.T., Dr. Woodfield discovered that Towery-Campbell's uterus had ruptured. (Jt. Ex. 1, Pg. 58)

81. As a result of the ruptured uterus Towery-Campbell sustained physical injury. (Jt. Stp. No. 8)

82. The medical care received by Towery-Campbell and E.T. after Dr. Woodfield arrived at Towery-Campbell's bedside at 10:56 p.m. was entirely appropriate. (T.T. Vol. I, Cohen, Pg. 62, ln. 6-9)

83. As a result of the ruptured uterus, E.T. sustained a birth injury from lack of oxygen. (Jt. Stp. No. 2)

84. As a result of the birth injury E.T. sustained permanent brain damage causing cerebral palsy and seizures, requiring physical, emotional, medical and vocational assistance for her entire life.

**B. The Applicable Standards of Care and Related Factual Findings**

85. The national standard of care in 1997 required continuous external fetal monitoring when the mother was in active labor. (T.T. Vol. II, Myers, Pg. 270, ln. 10-21).

86. From the time she was admitted until the time the emergency cesarean section was performed, Towery-Campbell never progressed into active labor. (T.T. Vol. II, Myers, Pg. 256, ln. 5-12); (T.T. Vol. I, Cohen, Pg. 116, 126, 134, ln. 2-5, 18-20, 12-14)

87. Therefore, CAIHF did not violate the standard of care by failing to continuously monitor Towery-Campbell's unborn child via an electronic fetal monitor.

88. Had an external fetal monitor been in place during that time period, the monitor would have likely shown fetal heart-rate decelerations beginning at 10:00 p.m., when Towery-Campbell's uterus began to rupture. (T.T. Vol. II, Myers, Pg. 305, ln. 17-23)

89. Uterine ruptures are usually accompanied by fetal heart-rate decelerations. (T.T. Vol. II, Myers, Pg. 307, ln. 21-24)

90. These decelerations get progressively more severe as the rupture progresses. (T.T. Vol. II, Myers, Pg. 307-08, ln. 25, 1-3)

91. Therefore, any decelerations which might have been observed between 10:00 p.m. and 10:30 p.m. would have been less severe than the ones noted after the external fetal monitor was replaced at 10:30 p.m. (T.T. Vol. II, Myers, Pg. 305-06, ln. 17-25, 1-4)

92. External fetal monitoring cannot forewarn a uterine rupture, it can, however, provide evidence that a uterine rupture is occurring. (T.T. Vol. II, Myers, Pg. 325, 329, ln. 16-23, 10-18)

93. The reassuring fetal heart decelerations that occurred at 10:32 p.m.-10:35 p.m—while indicating that something was occurring and that the patient needed evaluation—did not clearly indicate the presence of a uterine rupture and subsequent need for an immediate cesarean section. It follows, therefore, that the less severe decelerations which may have occurred prior to 10:30 p.m. would similarly not have clearly indicated the presence of a uterine rupture. (T.T. Vol. II, Myers, Pg. 332, 339, ln. 6-18, 1-6)

94. The external fetal monitor first clearly indicated the presence of an ongoing uterine rupture and subsequent need for an emergency cesarean section at approximately 10:43-10:44 p.m. when the monitor showed a significant, non-reassuring fetal heart-rate deceleration. (T.T. Vol. II, Myers, Pg. 334, ln. 4-8)

95. Given the national standard of care requiring that the incision initiating the cesarean section be made within thirty minutes of the decision to operate, so long as Dr. Woodfield made his initial incision into Towery-Campbell by 11:14 p.m. the alleged sub-standard

monitoring and physician response time cannot be said to be the proximate cause of Plaintiffs' injuries.

96. Although testimony at trial never established an actual time of initial incision, Dr. Woodfield's "Discharge Summary" indicates that it took him 1-1/2 to 2 minutes to deliver E.T. (Jt. Ex. 1, Pg. 58) Given that delivery occurred at 11:16 p.m., it would appear that the initial incision was made at approximately 11:14 p.m. Given that fact, the Court cannot conclude that either the alleged sub-standard monitoring, or doctor response time, were the proximate cause of Plaintiffs' injuries.

97. The national standard of care in 1997 required external fetal monitoring of patients being induced with Cervidil. The monitoring only had to be continuous when the patient was in active labor. (T.T. Vol. II, Myers, Pg. 344, ln. 5-14)

98. CAIHF satisfied the national standard of care because they intermittently monitored Towery-Campbell—who was not in active labor—while Cervidil was being administered. No evidence was presented at trial establishing that the monitoring had to be continuous while the Cervidil was in place, the evidence simply established that monitoring should take place.

99. The national standard of care in 1997 required monitoring of patients for 15 minutes after the removal of Cervidil. (T.T. Vol. II, Myers, Pg. 269, ln. 10-13)

100. CAIHF violated the standard of care by failing to monitor Towery-Campbell for 15 minutes after the removal of the Cervidil.

101. Plaintiffs, however, failed to establish that the failure to monitor in this 15 minute interval proximately caused Plaintiff' injuries.

102. The national standard of care in 1997 required CAIHF to maintain patient charts thoroughly documenting the patient's condition as well as documenting what treatments are being provided to the patient.

103. The nurses at CAIHF did not enter any "narrative" notes on Towery-Campbell's chart from 5:30 a.m. to 7:17 p.m. on May 27th. (T.T. Vol. I, Cohen, Pg. 100, ln. 7)

104. Towery-Campbell's chart, however, taken as a whole, thoroughly documents her treatment and condition. (T.T. Vol. II, Myers, Pg. 277-

78, 289, ln. 21-25, 1-25, 3-6)

105. Therefore, the Court finds that CAIHF's charting met the standard of care.

106. Even if the lack of narrative notes *did* violate the standard of care, that violation was not the proximate cause of Plaintiffs' injuries. (T.T. Vol. I, Cohen, Pg. 99, ln. 21-25)

107. The policy for on call physicians at CAIHF requires the doctor be within 30 minutes of the hospital. (Defendant's Exhibit 2 "Def. Ex. 2")

108. Dr. Woodfield's arrived at Towery-Campbell's bedside 21 minutes after being called.

109. There was no national standard of care in 1997 requiring an on call physician to arrive at the hospital in less than 30 minutes from the time they are called. (T.T. Vol. II, Myers Pg. 279-80, ln. 12-25, 1-8)

110. Therefore, Dr. Woodfield's 21 minute response time met the national standard of care. (T.T. Vol. II, Myers Pg. 279-80, ln. 12-25, 1-8)

111. Additionally, even if Dr. Woodfield's response time was sub-standard, Plaintiffs' cannot establish that this alleged violation of the standard of care was the proximate cause of Plaintiffs' injuries. *See infra* ¶ 96.

112. The national standard of care in 1997 required nursing staff to accurately relay information regarding the patient's condition to the on-call physician. (T.T. Vol. II, Myers Pg. 300, ln. 15-16)

113. Plaintiffs' alleged, but failed to prove, that the CAIHF nurses violated this standard of care when they called Dr. Woodfield at 10:35 p.m. Although the evidence at trial did not establish the exact substance of the 10:35 p.m. conversation between the CAIHF nurses and Dr. Woodfield, Dr. Woodfield clearly made the decision to come to the hospital based on the substance of that 10:35 p.m. phone conversation. (T.T. Vol. II, Myers Pg. 298-99, ln. 19-25, 1-4) Therefore, the Court concludes that the nurses accurately conveyed to Dr. Woodfield the severity of Towery-Campbell's condition.

114. Therefore, the Court finds that CAIHF's nurses met the standard of care by accurately relaying information to Dr. Woodfield.

## Conclusions of Law

1. This is an action under the Federal Tort Claims Act, 28 U.S.C. §§ 1346(b), 2671 et seq.

2. Jurisdiction is proper in this Court.

3. The employees of CAIHF, while acting within the scope of their employment, are deemed employees of the United States for purposes of the Federal Tort Claims Act, 28 U.S.C. §§ 1346(b) and 2671 et seq.

4. In a FTCA action, the court applies the law of the place where the alleged negligence occurred. *Austin v. U.S. ex rel. Dept. of Health and Human Services*, 16 F.3d 415 (10th Cir.1993).

5. "In Oklahoma three elements are essential to establish a prima facie case of medical negligence. These are '(1) a duty owed by the defendant to protect the plaintiff from injury, (2) a failure to properly exercise or perform that duty and (3) the plaintiff's injuries are proximately caused by the defendant's failure to exercise his duty of care.'" *McKellips v. Saint Francis Hospital, Inc*., 741 P.2d 467, 470 (Okla.1987).

6. CAIHF owed Plaintiffs a duty to provide them care consistent with a national standard of care. Okla. Stat. tit. 76, § 20.1; *Spencer v. Seikel*, 742 P.2d 1126 (Okl.1987).

7. Plaintiffs failed to establish any breach of the 1997 national standard of care that was the proximate cause of Plaintiffs' injuries.

6. Plaintiffs have therefore failed to prove medical negligence on the part of CAIHF and are thus not entitled to damages.

10. Judgment shall therefore be entered in favor of Defendant.

## CONCLUSION

The events underlying this case are nothing short of tragic. The catastrophic uterine rupture suffered by Rebecca Towery-Campbell left E.T. permanently physically and mentally disabled. Towery-Campbell must nurture and care for E.T. for the rest of her life, and that is undoubtedly a

costly burden to bear. Tragedy does not, however, equate liability—catastrophic events are often the fault of no one in the eyes of the law. In this case, the Court has concluded Defendant simply cannot be held legally liable for the tragedy that befell this mother and daughter. Therefore, the Court must enter judgment in favor of Defendant.

    IT IS SO ORDERED this 30th day of January, 2008.

*James H. Payne*
James H. Payne
United States District Judge
Eastern District of Oklahoma